UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JEFFREY D. MILNER and )
C&J SCIENCES, LLC, )
 )
    Plaintiffs, )
 )
v. )    Case No. 2:19-cv-2041-GMB
 )
TEAM HEALTH, *et al.*, )
 )
    Defendants. )

## **<u>MEMORANDUM OPINION</u>**

Pending before the court are six motions to dismiss. Docs. 71, 75, 76, 77, 78 & 79.  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge.  On December 17, 2019, Plaintiffs Jeffrey Milner and C&J Sciences, LLC filed suit alleging a host of state and federal claims arising out of Milner's employment as a medical doctor at various hospitals in Alabama. Doc. 1.  Milner has amended his complaint on three occasions and now asserts claims against 15 defendants, including various healthcare providers and individuals.  After careful consideration of the parties' submissions and the applicable law, and for the reasons that follow, the court concludes that the motions to dismiss are due to be granted to the extent that all federal claims will be dismissed with prejudice and all state-law claims will be dismissed without prejudice.

## I.  JURISDICTION AND VENUE

The court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction, nor do they contest that venue is proper in the Northern District of Alabama.  The court finds adequate allegations to support the propriety of both.

## II.  FACTUAL BACKGROUND

The following is a recitation of the facts as alleged in the Third Amended and Restated Complaint. Doc. 65.  Plaintiff Jeffrey Milner is a physician and former employee of Team Health, Baptist Health Systems Montgomery, Prattville Baptist Hospital, Baptist Health, and Baptist South and its affiliates.[1] Doc. 65 at 2.  He owns C&J Sciences, LLC.[2] Doc. 65 at 2.

Defendants Jon Cuba, John Milner, and Neal Johns are medical doctors who worked with Team Health and served as Milner's supervisors. Doc. 65 at 2.  Team Health operates emergency rooms at St. Vincent's Blount Hospital in Oneonta, Alabama; Baptist Health Systems and its affiliates; DCH Hospital in Tuscaloosa, Alabama; and Andalusia Health in Andalusia, Alabama. Doc. 65 at 3.  Defendant Deric Jones was a physician who worked at DCH Hospital. Doc. 65 at 3.  Defendants

---

[1] Milner has sued a number of Baptist entities.  The court describes them collectively as "Baptist Health" for the sake of simplicity.
[2] Because Milner refers to C&J Sciences as his "alter ego" and there are no separate allegations or injuries asserted on behalf of C&J Sciences, the court describes the plaintiffs collectively as "Milner."

Kristi Witcher and Ginger Henry were employed by Baptist Health as the chief executive officers ("CEOs") of Baptist South Hospital and Prattville Baptist Hospital, respectively. Doc. 65 at 3.  Prattville Baptist Hospital and Baptist South are Baptist Health affiliates. Doc. 65 at 4.  Eric Morgan was the CEO of Prattville Baptist Hospital. Doc. 65 at 4.

Team Health hired Milner in December 2011. Doc. 65 at 5.  In early October 2012, Team Health recruited Milner to work on a part-time basis at DCH Hospital. Doc. 65 at 5.  In December 2017, Team Health terminated Milner "because he engaged in a pattern of protected and federally mandated regulatory reporting and whistleblowing to protect patients but that might cost Team Health and Baptist Health money and business relationships." Doc. 65 at 5.  Early in Milner's tenure with Team Health, certain black staff members spoke with him about Deric Jones' "racist commentary." Doc. 65 at 6.  Milner reported the complaints to "the onsite medical director," who happened to be Jones. Doc. 65 at 6.  Milner also reported a specific comment Jones made to him, when Jones, who was white, asked if one of Milner's scribes, who was black, "walked the way [he or she] did because [he or she] was black or just cool." Doc. 65 at 6.  In retaliation, Jones began "making complaints about" Milner. Doc. 65 at 6.

At some point in 2012, Milner filed a complaint of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). Doc. 65 at 6.  The

3

complaint does not allege the outcome of the EEOC investigation.  Milner also met with Team Health's state medical director (Neil Christen, a white man) and its vice president of operations (Marcia Stiles-Lucas, a white woman), who "strongly encouraged him not to file a complaint." Doc. 65 at 6.  In exchange for his silence, they offered to increase his pay, make him a member of the "travel team," and remove him from the schedule at DCH Hospital. Doc. 65 at 6–7.

In January 2014, Milner was removed from the schedule at Andalusia Health because he "threatened to file an EMTALA violation against Andalusia."[3] Doc. 65 at 8.  The alleged violation centered on a refusal to accept a patient who was in critical condition. Doc. 65 at 8.  The same day, a Team Health representative called Milner and told him that the staff at Andalusia Health was "very upset" about his complaints and that he would be reassigned to Baptist Health in Montgomery. Doc. 65 at 8.  "Team Health and Andalusia harassed, bullied[,] and discriminated against [Milner] for engaging in the above protected acts and conspired to get [him] fired." Doc. 65 at 8.

In May 2014, Milner began working at Baptist Health in Montgomery, Alabama, and later at Prattville Baptist Hospital in Prattville, Alabama. Doc. 65 at 9.  There, Milner learned that doctors "were coerced to overprescribe opioids or risk

---

[3] "EMTALA" is an acronym for the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.

retaliation which could lead to" termination. Doc. 65 at 9–10.  Milner reported this practice to Team Health and Baptist Health, and he complained to Team Health management about his assignment to these facilities. Doc. 65 at 10.

The same month, a patient arrived at Prattville Baptist with an acute condition and Milner asked the staff to call a cardiologist at Baptist South Hospital. Doc. 65 at 11.  Milner "requested immediate catherization" but "recommended thrombolytics and transfer after the patient was stabilized." Doc. 65 at 11.  A nurse failed to follow his instructions and instead ordered the patient to be transferred to Jackson Hospital. Doc. 65 at 11.  After Milner spoke with the patient and the patient's family, they agreed to send the patient to Baptist South instead of Jackson Hospital. Doc. 65 at 11.  Milner believes the nurse forged his name on a transfer form because he "never signed her orders changing the transfer to Jackson [Hospital]." Doc. 65 at 12.

The next day, Milner met with CEO Ginger Henry and another doctor. Doc. 65 at 12.  Henry "chastised" him for "reporting the EMTALA violation," and Henry later received a promotion to "an executive level at Montgomery Baptist Health System." Doc. 65 at 12.  After this incident, Team Health again reassigned Milner, who split his time between Vaughan Medical Center and two Baptist Health hospitals in June 2014. Doc. 65 at 12–13.

In 2017, Milner reported an incident in which an orthopedist "in effect, refused to treat a young, black male in a motor vehicle accident by delaying

treatment." Doc. 65 at 13.  The patient later died. Doc. 65 at 13.  Milner reported the incident to Team Health executives, charge nurses, and "other representatives." Doc. 65 at 13.

Cuba, Milner, Johns, Witcher, and Henry, all of whom are white, "chastised [Milner] publicly and ridiculed [him] because of his past complaints to his hospital clients and to Team Health about improper racial comments, his unwillingness to transfer a critical patient and unstable patient[,] and his reports about the opioid prescription violations at Prattville." Doc. 65 at 14.  Each made "false statements relied on by Team Health and Baptist to terminate" Milner. Doc. 65 at 14.  In late 2017 and early 2018, Milner was removed from the work schedule entirely. Doc. 65 at 15.  He lost about $110,000 in expected income due to the lost time. Doc. 65 at 15.  Milner was terminated at some point in late 2017, Doc. 65 at 13, but he returned to work in February 2018 with reduced pay.[4] Doc. 65 at 15.

Milner's Third Restated and Amended Complaint states 21 causes of action. Doc. 65 at 17–42.  Count One is a claim for a violation of EMTALA's whistleblower protection provision against Team Health; Andalusia Health, LLC; and Baptist Health. Doc. 65 at 17–19.  Count Two is a False Claims Act claim against Team Health. Doc. 65 at 19–20.  Count Three appears to be a catchall "retaliation" claim

---

[4] Milner was terminated in December 2017, *see* Doc. 65 at 5, and the circumstances surrounding Milner's return to work in February 2018 are not reflected in the complaint.

against Team Health on the basis of the conduct of "its licensed agents, servants[,] and employees." Doc. 65 at 20–21.  Count Four seeks to hold Team Health liable for the unspecified wrongdoing of its "supervisors, physicians, nurses, independent contractors, [and] employees." Doc. 65 at 21–23.  Count Five is a claim for discrimination and retaliation under 42 U.S.C. § 1981 against Team Health. Doc. 65 at 23–24.  Counts Six, Seven, Eight, Nine, Fifteen, and Twenty-One include various state-law claims against Team Health, St. Vincent's, Baptist Health, and individual defendants Cuba, Johns, Lewis, Henry, Witcher, Morgan, and Jones. Doc. 65 at 24–28, 34–35 & 40–41.  Count Ten includes one EMTALA and two state-law claims against Henry. Doc. 65 at 28–29.

Count Eleven asserts "False Claims Act/Anti-Kickback Whistleblower [v]iolations" against Baptist Health. Doc. 65 at 29–30.  Counts Twelve and Thirteen appear to assert the same theories of liability as Counts Three and Four, but against Baptist Health. Doc. 65 at 30–33.  Count Fourteen is a § 1981 discrimination and retaliation claim against Baptist Health. Doc. 65 at 33–34.  Count Sixteen includes defamation and "False Claims Act/Anti-Kick Back Whistleblower Retaliation" claims against Baptist Heath. Doc. 65 at 35–36.  Count Seventeen is a claim under EMTALA's whistleblower protection provision against Baptist Health. Doc. 65 at 36–37.  Count Eighteen asserts multiple state-law claims and an EMTALA claim against Kristi Witcher. Doc. 65 at 37–38.  Count Nineteen includes a variety of state

and federal claims against Cuba, Johns, and Lewis. Doc. 65 at 38–39.  Finally, Count Twenty asserts a § 1981 discrimination claim as well as two state-law claims against Jones. Doc. 65 at 39–40.

## III.  STANDARD OF REVIEW

In consideration of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is "plausible on its face" if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Factual allegations need not be detailed, but "must be enough to raise a right to relief above the speculative level," *id.*, and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" will not suffice. *Iqbal*, 556 U.S. at 678.

# IV.  DISCUSSION

## A.    Pleading Deficiencies

The defendants filed a joint motion (Doc. 76) in which they argue that Milner's complaint constitutes an impermissible shotgun pleading.   The court agrees.   Milner's Third Restated and Amended Complaint is replete with vague, meandering factual allegations, incorporations by reference, counts containing multiple causes of action, and exhibits a striking lack of clarity—providing little notice to the defendants and to the court of which of Milner's many factual allegations support which cause of action, and which cause of action is asserted against each defendant. *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.").

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and that each factual allegation be "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) & (d)(1).  Further, Rule 10 requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b).  The primary purpose of these two rules is to enable the opposing parties to respond adequately and appropriately to the claims

9

against them, and to allow the court to "'determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted.'" *Weiland*, 792 F.3d at 1320 (quoting *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)).

In failing to comply with these rules, Milner's complaint exhibits all of the characteristics of a shotgun pleading, which have been "roundly condemned" in the Eleventh Circuit "both for the confusion they cause litigants and the havoc they wreak on the docket." *McCall v. Bank of Am., N.A.*, 2016 WL 5402748, at *1 (M.D. Ala. Sept. 26, 2016).  In *McCall*, a district court in this circuit explained that there are four varieties of shotgun pleadings:

> (1) complaints "containing multiple counts where each count adopts the allegations of all preceding counts," (2) complaints that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," (3) complaints that fail to "separat[e] into a different count each cause of action or claim for relief," and (4) complaints that "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."

*Id.* (quoting *Weiland*, 792 F. 3d at 1322–23).  Here, Milner's complaint reads like a "narrative suggesting, but not clearly and simply stating, a myriad of potential claims." *Giles*, 359 F. App'x at 93.  For this reason, the complaint contains all four of the pleading flaws outlined above.

First, every count in the complaint incorporates by reference all of the

complaint's preceding factual allegations, making it impossible to determine the factual allegations that support each cause of action.  This results in certain factual allegations supporting causes of action "that could not possibly be material to that specific count." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).  "It is not enough to clearly incorporate all facts pleaded in the amended complaint, as Plaintiff has done here; rather, the supporting facts must be pleaded in the count asserting the cause of action." *McCall*, 2016 WL 5402748, at *2 (internal quotation marks omitted).  Given that Milner's complaint contains 21 counts and a litany of factual allegations, each count is supported by a host of factual allegations that are immaterial and irrelevant to the causes of action asserted therein.

Second, the complaint contains factual allegations that often are vague and conclusory and "not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1320.  Milner complains of unspecified racist commentary; criticizes certain individuals' personalities, professionalism, and character; and airs a number of workplace grievances—all of which have no sounding in any state or federal cause of action.  For example, Milner refers to Henry as a "known racist," accuses an unnamed doctor of working "while obviously intoxicated," and complains of a "systemic culture of harassment and intimidation" without pleading in specific detail which acts were harassing and intimidating and which causes of action those allegations support.  Indeed, Milner does little to explain how any of

these salacious allegations support the various and sundry legal claims he has asserted.  The court is thus left to sift through the 21-count complaint and guess what in Milner's patchwork factual allegations could support any of his numerous state and federal causes of action.

Third, several counts in the complaint contain multiple causes of action, and in many counts the court is unable to decipher which cause of action is directed toward which defendant.  For example, Count Five appears to assert claims under 42 U.S.C. § 1981 for both retaliation and discrimination; Counts Ten and Eighteen include claims for retaliation under EMTALA, defamation, and interference with business relationships; and Counts Sixteen, Nineteen, Twenty, and Twenty-One each assert a panoply of claims.  Moreover, throughout the complaint, Milner refers collectively to groups of defendants often without differentiating between each defendant's conduct or specifying which particular defendant each claim is brought against.  Lumping all of the defendants into one collective group in this manner "does not give fair notice" to the defendants of the claims against them and the factual allegations underlying those claims. *McCall*, 2016 WL 5402748, at *2; *see also Twombly*, 550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires . . . fair notice [to the defendant] of what the claim is and the grounds upon which it rests.") (internal quotation marks omitted).

Thus, for its failure to comply with the pleading directives established by

controlling case law and the Federal Rules of Civil Procedure despite multiple opportunities to amend, Milner's Third Restated and Amended Complaint is due for dismissal on this basis alone. *See, e.g.*, *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018). Nevertheless, the court will engage in a substantive analysis of Milner's federal claims, all of which are due for dismissal.[5]

## B.    Federal Claims

### 1.    *EMTALA Claims*

EMTALA, 42 U.S.C. § 1395dd, requires "participating hospitals" to "screen any individual who comes to its emergency room seeking treatment in order to determine whether the individual has an emergency medical condition." *Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1310 (11th Cir. 2006) (citing § 1395dd(a)). If an individual has an emergency medical condition, the hospital must "provide stabilizing treatment before discharging or transferring the patient." *Id.* (citing § 1395dd(b)). "An EMTALA violation thus arises when a hospital either fails to adequately screen a patient, or discharges or transfers the patient without first stabilizing his emergency medical condition." *Id.*

Importantly, EMTALA "was not intended to be a federal malpractice statute." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002). Under the screening

---

[5] To the extent there are any claims against any defendants not addressed in the discussion below, the court was unable to decipher these claims and they are dismissed for the reasons discussed in this section.

requirement, emergency rooms must "provide an appropriate medical screening to any individual seeking treatment in order to determine whether the individual has an emergency medical condition." *Id.*   If the individual has an emergency medical condition, "the hospital is required to provide stabilization treatment before transferring the individual." *Id.*   This means that the hospital must "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A).

"[A] civil action under EMTALA must be brought within two years of the date of the alleged violation." *Harry*, 291 F.3d at 770 (citing § 1395dd(d)(2)(C)). Thus, any alleged violation before December 17, 2017—two years prior to the date Milner filed suit—is time barred.   The complaint's 2014 incident occurred well outside of EMTALA's two-year statute of limitations and therefore cannot serve the basis for any EMTALA claim.   On the other hand, Milner's complaint alleges only that the other EMTALA violation occurred in December 2017. *See* Doc. 65 at 13. Because Milner admits that he was fired in December 2017, this incident likely occurred before December 17, 2017.   On the face of the complaint, however, the court cannot conclude that the 2017 incident necessarily is time barred.

In any event, the 2017 incident cannot form the basis for a valid EMTALA

claim because Milner has not alleged sufficient facts to suggest that an EMTALA violation occurred.   Milner does not claim that the patient in question had an emergency medical condition or that he was denied emergency medical treatment. Milner also does not provide any details regarding the patient's injuries, the timing of his arrival at the hospital and eventual treatment, or what type of care he ultimately received.   Instead, Milner simply asserts that an orthopedist "in effect, refused to treat" the patient "by delaying treatment." Doc. 65 at 13.  This vague and conclusory allegation, without more, does not pass muster under *Twombly* and *Iqbal* and cannot serve as the basis for a viable EMTALA claim or any other cognizable federal cause of action.

### a.   Individual Defendants

As evidenced by the plain language of the statute, EMTALA provides for "a private cause of action against hospitals, but not individual physicians." *Lane v. Calhoun-Liberty County Hosp. Ass'n, Inc.*, 846 F. Supp. 1543, 1548 (N.D. Fla. 1994).  Accordingly, all of Milner's EMTALA claims against any of the individual defendants are due for dismissal. *See Holcomb v. Monahan*, 807 F. Supp. 1526, 1531 (M.D. Ala. 1992) (dismissing EMTALA claim against an individual physician because "there is no provision within § 1395dd, *et seq.* that allows a private plaintiff to sue a responsible physician for violating the statute").

### b.   Whistleblower Protection

EMTALA's whistleblower provision prohibits hospitals from taking any "adverse action against . . . any hospital employee because the employee reports a violation of a requirement" of EMTALA. 42 U.S.C. § 1395dd(i).   To state a claim under this provision, a plaintiff must allege "(1) a good faith, reasonable belief that the defendant was engaged in a violation of EMTALA; and (2) that, as a result of the plaintiff's belief . . . she either refused to authorize a discharge or transfer of the relevant patient or reported the violation." *David v. BayCare Health Sys., Inc.*, 2019 WL 6842085, at *3 (M.D. Fla. Dec. 16, 2019).   With respect to the two 2014 incidents, the nearly four-year delay between these incidents and Milner's eventual termination forecloses any viable EMTALA retaliation claim because there are no other facts connecting Milner's 2014 complaints to his late-2017 firing. *See, e.g.*, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that for retaliation claims "mere temporal proximity, without more, must be very close," and a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough") (internal quotation marks omitted).

Moreover, Milner's factual allegations do not support any EMTALA violation occurring in 2014.   Milner alleges that a nurse disregarded his order to transfer a patient to one hospital and opted to send the patient to a different hospital. Doc. 65 at 11.   Milner explained that he was "disheartened and disappointed" by the incident

and that he met the next day with CEO Ginger Henry. Doc. 65 at 12.  According to Milner, Henry "chastised him" for reporting the incident. Doc. 65 at 12.  But the factual allegations relating to the underlying incident do not allege an EMTALA violation.  Milner does not claim that the hospital inadequately screened the patient or transferred the patient before stabilizing an emergency medical condition.  Rather, Milner has described a garden-variety workplace dispute and explained that he was upset by his superior's response to his report of the dispute.  Furthermore, as the court has already found, Milner did not properly allege an EMTALA violation arising out of the 2017 incident.  Accordingly, any claim under EMTALA's whistleblower protection provision fails to state a claim upon which relief can be granted.

### 2.    *False Claims Act*

Under the antiretaliation provisions of the False Claims Act ("FCA"), an employee may not be "discharged because of lawful acts taken 'in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section.'" *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010) (citing 31 U.S.C. § 3730(h)).  Importantly, "§ 3730(h) only protect[s] an employee from retaliation when there was at least a distinct possibility of litigation under the False Claims Act at the time of the employee's actions." *Id.* (internal quotation marks omitted).  If an

employee's alleged actions are "sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h)." *Id.* at 1304.

No such allegations exist here.  Milner offers only that he "complained about the opioid prescription and billing abuse to Team Health and Baptist Health to no avail." Doc. 65 at 19.  These do not constitute "lawful acts in furtherance of" an FCA action.  Nor are there any allegations sufficient to support a reasonable conclusion that Milner's employer "could have feared being reported to the government for fraud or sued in a *qui tam* action." *Lymphatx*, 596 F.3d at 1303.  And, even assuming Milner had alleged that he engaged in protected activity under the FCA, he has not pled any facts plausibly suggesting that his termination over three years later was caused by that activity. *See, e.g.*, *Nesbitt v. Candler County*, 945 F.3d 1355, 1360 (11th Cir. 2020) (concluding that FCA retaliation claims require a showing of but-for causation, meaning that the plaintiff must allege that "the harm would not have occurred in the absence of . . . his protected conduct") (internal quotation marks omitted).  Accordingly, any claim asserted under the FCA fails to state a claim upon which relief can be granted.

### 3.    *42 U.S.C. § 1981 Claims*

42 U.S.C. § 1981 "protects the equal right . . . to make and enforce contracts

without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (internal quotation marks omitted).   The right to "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).   "To state a claim of race discrimination under § 1981, a plaintiff must allege facts establishing: (1) that he is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1171–72 (11th Cir. 2016) (internal quotation marks omitted).   "Section 1981 requires a showing of purposeful discrimination, and provides protection only on the basis of race." *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1352 (N.D. Ga. 2017) (citations and internal quotation marks omitted).

Milner has not alleged a viable § 1981 claim because he has not alleged facts from which the court could plausibly infer that any of the defendants discriminated against him on the basis of his race.   To state a viable claim for § 1981 retaliation, Milner must allege that, "but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).   Milner has made no allegation that, but for his race, he would not have been terminated.   The closest he comes to stating a viable

discrimination claim is the allegation that Henry "belittled" his complaints "about violations of federal law and treated him negatively because of his race." Doc. 65 at 33.  But this conclusory allegation is plainly insufficient to state a plausible claim for race discrimination under § 1981. *See, e.g.*, *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300–01 (11th Cir. 2010) (holding that the "broad statement" that a plaintiff "was subjected to a hostile discriminatory environment on the basis of his race, in violation of 42 U.S.C. § 1981" was insufficient to survive a motion to dismiss).

Milner's complaint also brings generalized allegations of racial prejudice he encountered at various points throughout his career, including that he was "chastised" for reporting "improper racial comments," that a "staffer" made "racial slurs and racially discriminatory statements" in 2011 or 2012, that Deric Jones made "racial jokes," and that Jones and Ginger Henry are "known racist[s]." Doc. 65 at 6, 14, 17, 23, 33 & 39.  As these allegations suggest, Milner's § 1981 allegations are based on a retaliation theory. *See, e.g.*, Doc. 65 at 23 ("Team Health permitted Dr. Deric Jones to make negative comments about and ultimately adopted and ratified his views by firing the plaintiff in retaliation for this report and a series of reports he made about violations of federal law, including 42 U.S.C. § 1981, designed to protect whistle blowers.").

A *prima facie* case of retaliation under § 1981 requires the plaintiff to allege that (1) he engaged in statutorily protected activity, (2) he endured a materially

adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1259 (11th Cir. 2012).  Retaliation under § 1981 "includes retaliation for a plaintiff's opposition to race discrimination, whether or not he personally is the victim of race discrimination." *Tucker v. Talladega City Sch.*, 171 F. App'x 289, 295 (11th Cir. 2006).

      As is by now a common theme, the court finds that Milner has not sufficiently alleged that the conduct he reported rose to the level of race discrimination.  Instead, he alleges that he complained about an assortment of "racial jokes," "improper racial comments," and "racially discriminatory statements."  But the presence of racially discriminatory or inappropriate statements does not make out a claim for race discrimination under § 1981.  At best, Milner's allegations of stray racial comments would relate to a racially hostile work environment claim, not a race discrimination claim. *See, e.g.*, *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248–49 (11th Cir. 2014) (establishing the five elements for a hostile work environment claim based on race, including "unwelcome racial harassment" that was "based on race" and "severe or pervasive enough to alter the terms and conditions" of employment and "create a discriminatorily abusive work environment").  But Milner has not brought a claim under this theory of liability (in fact, the words "hostile" and "environment" do not appear in his 42-page complaint).  Accordingly, any claim for discrimination or

retaliation under § 1981 is due for dismissal.

## C.   State-Law Claims

Pursuant to 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over Milner's remaining state-law claims because his federal claims will be dismissed. *See* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction").  Where all federal claims are dismissed prior to trial, district courts are discouraged from weighing in on the remaining state-law claims. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").  Before dismissing Milner's state-law claims, the court must consider the factors of judicial economy, convenience, fairness, and comity. *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

"Both comity and economy are served when issues of state law are resolved by state courts." *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002).  "Federal courts are (and should be) loath to wade into uncharted waters of

state law, and should only do so when absolutely necessary to the disposition of a case." *Ameritox*, 803 F.3d at 540.  Indeed, the Supreme Court has declared that "[n]eedless decisions of state law should be avoided as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  Here, the court finds no reason to depart from this practice by adjudicating Milner's many state-law claims.

Further, there is nothing before the court to suggest that the remaining factors of convenience and fairness weigh in favor of retaining supplemental jurisdiction. Moreover, the court can discern no possibility of significant prejudice to Milner, particularly in light of § 1367(d)'s provision tolling the statute of limitations for his remaining claims under state law. *See* 28 U.S.C. § 1367(d).  Accordingly, the court declines to exercise supplemental jurisdiction over Milner's state-law claims pursuant to § 1367(c)(3) and these claims are due to be dismissed without prejudice.

A final judgment will issue contemporaneously.

DONE and ORDERED on September 23, 2020.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE